SAN FRANCISCO COUNTY DEMO-
CRATIC CENTRAL COMMITTEE; San
Francisco County Republican Central
Committee; Los Angeles County Demo-
cratic Central Committee; Alameda
County Democratic Central Committee;
Santa Clara County Democratic Cen-
tral Committee; Solano County Demo-
cratic Central Committee; Placer
County Democratic Central Committee;
State Central Committee of the Liberta-
rian Party of California; Bert Coffey;
Nancy Walker; Linda Post; Dolph An-
drews; Carolyn Wallace; Mary King;
Thomas Romero; Mary Gingell; David
E. Sturrock; Walter Layson; Mary
Vail; Roy Christman; James Fay;
Northern California Committee For
Party Renewal; Southern California
Committee For Party Renewal; and
National Committee For Party Renew-
al, Plaintiffs-Appellees,

v.

March Fong EU, Secretary of State of the
State of California, John Van De
Kamp, Attorney General of the State of
California; Arlo Smith, District Attor-
ney of San Francisco County, et al.,
Defendants-Appellants.

No. 84–1851.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 15, 1984.

Withdrawn from Submission
Aug. 5, 1985.

Resubmitted Nov. 27, 1985.

Decided June 18, 1986.

James J. Brosnahan, Cedric C. Chao, Paul R. Dieseth, Paul Flum, Morrison & Foerster, San Francisco, Cal., for plaintiffs-appellees.

Geoffrey L. Graybill, Deputy Atty. Gen., Sacramento, Cal., for defendants-appellants.

Before WRIGHT, SKOPIL and NORRIS, Circuit Judges.

NORRIS, Circuit Judge:

This case involves a First Amendment challenge to various sections of the California Elections Code. The challenged sections specify the membership of the state central committees of ballot-qualified political parties and the term of office of committee chairs, and prohibit both state and county central committees from endorsing candidates in party primaries.

Plaintiffs are various county central committees of the Democratic and Republican parties, the state central committee of the Libertarian party, members of these and other party central committees, and various other groups and individuals active in partisan politics in California. They sued the Secretary of State and Attorney General of California and the district attorneys of various counties (hereinafter, "the Secretary") for declaratory and injunctive relief under 42 U.S.C. § 1983 seeking to vindicate their asserted First Amendment right to endorse candidates running in California's direct primary elections and to structure and conduct their internal affairs free of unjustified interference by the state.[1]

In the first count of their first amended complaint, plaintiffs challenge the constitutionality of Cal.Elec.Code § 11702, which prohibits state and county central committees from endorsing, supporting, or opposing candidates for partisan office in direct primary elections. Plaintiffs' second count challenges sections of the Elections Code

---

1. The First Amendment is made applicable to the states through the Fourteenth Amendment. *See, e.g., Edwards v. South Carolina*, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963); *Schneider v. State*, 308 U.S. 147, 160, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939).

and the state constitution that prohibit central committees from endorsing candidates in nonpartisan county, city and school elections. Plaintiffs' third count challenges Code sections that prescribe the membership of state central committees, the term of office of state committee chairpersons, the time and place of state and county central committee meetings, and the dues to be paid by county committee members.

Plaintiffs moved for summary judgment on all three counts. In response, the Secretary moved to dismiss the amended complaint under Fed.R.Civ.P. 12(b)(1) and (6) and cross-moved for summary judgment. The district court granted summary judgment on plaintiffs' first count, ruling that section 11702's ban on preprimary endorsements violated the First Amendment. The court stayed all proceedings on plaintiffs' second count under the abstention doctrine of *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The court granted partial summary judgment on plaintiffs' third count, ruling that the sections prescribing the membership of state central committees and the term of their chairs violated the First Amendment.[2] The court, however, denied plaintiffs' motion for summary judgment with respect to those Code sections regulating the time and place of committee meetings and county committee dues. The court also denied in all respects the Secretary's motion to dismiss and cross-motion for summary judgment.

Although the district court did not finally dispose of all issues with respect to all parties, it directed the entry of final judgment for plaintiffs under Fed.R.Civ.P. 54(b) on the first count and as to those claims in the third count decided in plaintiffs' favor.[3] Accordingly, we have jurisdiction to hear the Secretary's appeal under 28 U.S.C. § 1291 (1982).

## I

Plaintiffs contend that California's political parties and their governing bodies—the state and county central committees—are voluntary associations entitled to the full protection of the First Amendment. They argue that California's prohibition of preprimary endorsements and the state's regulation of party structure and internal affairs abridge their freedom of political expression and association.[4] In response, the Secretary argues that the state and county central committees of ballot-qualified political parties in California do not enjoy First Amendment status because they are public entities, not private associations. In the alternative, the Secretary argues that the challenged provisions of the Election Code pass First Amendment muster because they are narrowly drawn regulations that serve compelling state interests.

"Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association." *Sweezy v. New Hampshire*, 354 U.S. 234, 250, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957). Because "[e]xercise of these basic freedoms ... has traditionally been through the media of political associations," *id.*, political parties as well as individual party adherents enjoy First Amendment rights. *See Democratic Par-*

2. The district court invalidated the following sections: Cal.Elec.Code §§ 8660, 8661, 8663—67, 8669 (Democratic State Central Committee); §§ 9160, 9160.5, 9161, 9161.5, 9162—64 (Republican State Central Committee) (West Supp. 1984); § 9274 (Republican State Central Committee Chairman); and § 9816 (Peace & Freedom State Central Committee Chairperson) (West 1977).

3. We review a summary judgment *de novo. Lojek v. Thomas*, 716 F.2d 675, 677 (9th Cir.1983). Summary judgment is appropriate if "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of

law." Fed.R.Civ.P. 56(b). We also review *de novo* the district court's denial of the Secretary's motion to dismiss under Fed.R.Civ.P. 12(b)(1) & (6) for want of subject matter jurisdiction and for failure to state a claim upon which relief may be granted. *See, e.g., Trerice v. Pedersen*, 769 F.2d 1398, 1400 (9th Cir.1985).

4. Plaintiffs also claim that the state's regulation of ballot-qualified parties violates their rights to equal protection of the laws under the Fourteenth Amendment. It is unnecessary to reach this claim.

*ty v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981); *Cousins v. Wigoda*, 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975).[5] Moreover, "[a]ny interference with the freedom of a party is simultaneously an interference with the freedom of its adherents." *Sweezy*, 354 U.S. at 250, 77 S.Ct. at 1212; *see Republican Party v. Tashjian*, 770 F.2d 265, 278 (2nd Cir.1985), *prob. juris noted,* —— U.S. ——, 106 S.Ct. 783, 88 L.Ed.2d 762 (1986). Finally, courts have "placed the internal workings of a political party squarely within the protection of the First Amendment." *Ripon Society Inc. v. National Republican Party*, 525 F.2d 567, 586 (D.C.Cir.1975), *cert. denied*, 424 U.S. 933, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976).

In this case we must apply these settled First Amendment principles to the restrictions imposed on California political parties by various provisions of the California Elections Code. To place the important constitutional questions presented by this appeal into perspective, we will first provide an overview of state regulation of political parties in California.

Like our national political parties,[6] California's political parties were originally unregulated voluntary associations of individuals "governed largely by custom and usage." *Unger v. Superior Court*, 37 Cal.3d 612, 615, 692 P.2d 238, 209 Cal.Rptr. 474 (1984) (*Unger II*); *see also* 59 Ops. Cal. Atty. Gen. 60 (1976); 23 Ops. Cal. Atty. Gen. 119, 120 (1954) (citing *Spelling v. Brown*, 122 Cal. 277, 279, 55 P. 126 (1898)). These voluntary associations "fix[ed] membership criteria, nominat[ed] candidates for public office, conduct[ed] their campaigns, and shap[ed] their platforms" with neither

recognition nor interference from the state. Friedman, *Reflections Upon the Law of Political Parties*, 44 Cal.L.Rev. 65, 66 (1956); *see also Spier v. Baker*, 120 Cal. 370, 380, 52 P. 659 (1898). Internal party decisions were generally made at party conventions where choices as important as "who shall represent [the] party on the election day ballot [were] left exclusively to a select group of its leaders." J. Owens, E. Costantini & L. Weschler, *California Politics and Parties* 78 (1970) [hereinafter, *"California Politics"*]. At the turn of the century, Progressive Republicans, led by Hiram Johnson, set out to replace this prevailing laissez-faire regime with one ostensibly designed to democratize and purify the parties by rescuing them from the stranglehold of wealthy special interests.[7] *See Assembly Interim Committee on Elections and Reapportionment*, Report on Political Party Organization 7, *reprinted in* 1 Appendix to Journal of the Assembly (1963).

Spurred on by the Progressive reformers, the state legislature took the first—and most fundamental—step toward democratizing political parties by enacting a direct primary law, which transferred the power to nominate candidates from party organizations to the voters themselves. *See Hart v. Jordan*, 168 Cal. 321, 143 P. 537 (1914); *Katz v. Fitzgerald*, 152 Cal. 433, 93 P. 112 (1907); *see also California Politics, supra* at 35. As part of the same reform movement (*see* Opinion, Legislative Counsel of California, February 23, 1978, Excerpt of Record 465), the California legislature required political parties to form

---

**5.** *See also* Weisburd, *Candidate-Making and the Constitution: Constitutional Restraints on and Protections of Party Nominating Methods,* 57 S.Cal.L.Rev. 213, 265 (1984) [hereinafter Weisburd, *Candidate-Making and the Constitution* ] ("parties as parties have associational rights").

**6.** *See, e.g., O'Brien v. Brown*, 409 U.S. 1, 4, 92 S.Ct. 2718, 2720, 34 L.Ed.2d 1 (1972) (per curiam) ("our national political parties first came into being as voluntary associations of individuals"); *see also* A. De Tocqueville, 2 *Democracy in*

*America* 129 (Bradley, ed. 1954); D. Broder, *The Party's Over: The Failure of Politics in America* 172 (1971).

**7.** The most notorious special interest and the chief impetus to reform was the Southern Pacific Railroad Company, nicknamed "the Octopus" because of its allegedly ubiquitous corrupting influence on state government. *California Politics, supra* at 32. According to one commentator, the Southern Pacific "literally ran the state's politics." *Id.* at 31.

state and county central committees and adopted rules for party governance.[8]

The Elections Code provisions regulating party governance are byzantine in their complexity[9] and vary in extent and detail from party to party. *See, e.g.,* Cal.Elec. Code §§ 8500—8945 (Democratic Party), 9000—9510 (Republican Party), 9600—9745 (American Independent Party), 9750—9855 (Peace and Freedom Party). To take the Democratic party as an illustration, the Code establishes party central committees at the county, *id.* § 8820, and state-wide levels, *id.* § 8660; it dictates the size, membership, and apportionment of these committees, *id.* §§ 8660—8672 (state committee), 8820—8834 (county committees); it mandates the place and time of committee meetings, *id.* §§ 8710—8711, 8920—8922; it enjoins the state central committee to observe standard parliamentary procedure, *id.* § 8778; and it provides for the election of a state chair and vice-chair and requires that they be selected alternately from the northern and southern sections of the state. *Id.* § 8774.

Most importantly, the Elections Code assigns to each party's state central committee the "statutory function of party leadership" by placing it "at the very helm of the party's general election campaign." 23 Ops Cal. Atty. Gen. 119, 123 (1954); *see*

Cal.Elec.Code §§ 8776, 8940.[10] Similarly, the Code provides that the county committees "shall have charge of the party campaign under general direction of the state central committee." *Id.* §§ 8940 (Democratic Party), 9440 (Republican Party), 9740 (American Independent Party), 9850 (Peace and Freedom Party). Hence, at least in theory, the central committees constitute the governing bodies of the parties.

In practice, commentators have noted that the statutory organization of the central committees is so cumbersome as to make only titular leadership realistically possible.[11] *See California Politics, supra* at 190–91. For example, the Democratic state central committee is composed of over 1,000 members—more than five times the size of the State Convention. *Id.* at 191. The membership includes all Democratic officeholders from Governor to members of the Congress and the state legislature. Cal.Elec.Code § 8660(a). Each statewide officeholder,[12] United States Senator and state senator, appoints three other state committee members, "at least two of whom shall be of the opposite sex"; and each member of Congress and the State Assembly appoints two other members, "at least one of whom shall be of the opposite sex." *Id.* § 8663. Defeated party nomi-

---

**8.** The political reforms that the Progressives wrote into California law during the first two decades of this century parallel laws adopted in other states. Between 1890 and 1920, most states adopted "elaborate legal codes closely regulating the state parties' internal affairs: the codes generally stipulated what committees and conventions the parties must have, the procedures by which their members are selected, who may participate in making the parties' decisions, and what powers, if any, each party organ has over the others." A. Ranney, *Curing the Mischief of Faction: Party Reform in America* 18 (1975). For a thorough catalogue of the reform measures implemented in the other states, see J. Starr, *The Legal Status of American Political Parties I,* 34 Amer. Pol Sci. Rev. 439 (1940).

**9.** *See* Friedman, *supra* at 71 (describing the laws governing the parties as "an illogical, disordered pattern").

**10.** *See* Friedman, *supra* at 69 ("[i]n statutory contemplation California party organs have been left with one major role—to campaign for

the general election success of the party nominees selected by the voters at the primary"); *see also* 23 Ops. Cal. Atty. Gen. 119, 121–23 (1954).

**11.** The separate Elections Code provisions prescribing the membership of the Republican, American Independent, and Peace and Freedom central committees differ in some respects from the Democratic Party provisions. *See, e.g.,* Cal. Elec.Code §§ 9000—9510 (Republican Party). For instance, Elections Code § 8774 requires that the chairperson of the Democratic Party state central committee serve a single term to be fixed by party by-laws and that the chair alternate between residents of northern and southern California. Section 9274 duplicates the north-south rotation requirement of section 8774 but specifies a fixed term of two years for the Republican Party chair.

**12.** The state-wide officeholders are the Governor, the Lieutenant Governor, the Treasurer, the Controller, the Attorney General, the Secretary of State, and members of the State Board of Equalization. Cal.Elec.Code § 8660(a)(1)—(7).

nees for these offices also serve on the committee and appoint their share of additional members. *Id.* § 8661. Rounding out the membership are members elected by the county committees on a basis proportionate to registered party strength in each county, *id.* §§ 8660(b), 8667; five members elected by a caucus convened in each assembly district, *id.* § 8660(g) & 8669; and miscellaneous others.[13]

Thus, the legislative design favors elected officials over party members who do not hold elective office. The design particularly favors incumbent state legislators, who enact and amend the legislation. Members of the California State Assembly and Senate can control as many as 400 positions; in comparison, the California delegation to the United States Congress and Senate controls only 143 positions. *See* Cal.Elec.Code § 8660.

Finally, all party central committees have been prohibited from endorsing or opposing candidates in party primaries. Commentators have claimed that, like the cumbersome provisions dictating party governance, the ban on preprimary endorsements has weakened political parties, especially their ability to recruit and elect candidates who will further the party's goals.[14] *See* Friedman, *supra* at 70; *California Politics, supra* at 4; *see also* 23 Ops. Cal. Atty. Gen. 119, 122 (1954). Plaintiffs' uncontroverted affidavits show that by excluding the committees from the process of choosing party nominees, "a basic function of a political party [in our system]," *Kusper v. Pontikes*, 414 U.S. 51, 58, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973), the state has effectively drained party central committees of political power. Although the legislature has charged the committees with the responsibility of running the general election campaigns of party nominees, in reality nominees run their own campaigns through ad hoc campaign committees. Supplemental Declaration of Austin Ranney; *see also California Politics, supra* at 199–200. Indeed, the California Attorney General has opined that the ban on preprimary endorsements reflects the Progressives' "intent to minimize the role of the established party agencies." 23 Ops. Cal.Atty.Gen. at 122. Overall, it has been observed that California's regulation of political parties has pushed them "out of much of their original domain." Friedman, *supra* at 69.

## II

At the outset, we consider various threshold issues raised by the Secretary in her motion to dismiss below and renewed on appeal. The Secretary presents four reasons for reversing the district court without reaching the merits: (1) plaintiffs' complaint fails to raise a justiciable controversy; (2) plaintiffs lack standing to bring the action; (3) the action is barred by the Eleventh Amendment; and (4) the district court should have abstained under the *Pullman* doctrine from adjudicating the first and third causes of action. We find none of these arguments persuasive.

## A

Article III limits the exercise of federal judicial power to actual cases and controversies. *NAACP v. City of Richmond*, 743 F.2d 1346, 1350 (9th Cir.1984). A plaintiff who challenges a statute must demon-

---

13. The miscellaneous state committee members include the following: (1) the national committeemen and national committeewomen of the party; (2) such immediate past party officers as are provided by party by-laws; (3) the President of the California Democratic Council and the President of the Federation of Young Democrats; and (4) former elected, nonjudicial officeholders. Cal.Elec.Code § 8660 *passim.*

14. Partisan politics in California has been further inhibited by other provisions of the Elections Code. California has adopted non-parti-

san municipal elections, the initiative and referendum, and at one time allowed cross-filing, which permitted candidates with declared allegiance to one party to run simultaneously for the nomination of another party. Each of these Progressive-era innovations has curbed the ability of the party organization to shape the party's political agenda and support sympathetic candidates. *See California Politics* at 4 & 294–95; *cf.* Ranney, *Curing the Mischief of Faction, supra* at 17–19.

strate "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979); *see also O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). But "[o]ne does not have to await the consummation of the threatened injury [to seek relief]. If the injury is certainly impending that is enough." *Babbitt,* 442 U.S. at 298, 99 S.Ct. at 2308 (quoting *Pennsylvania v. West Virginia,* 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923)). When a plaintiff seeks to engage in conduct proscribed by statute and a credible threat of prosecution exists, he need not "expose himself to actual arrest and prosecution to be entitled to challenge [the] statute...." *Id.* (quoting *Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974)); *see also Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973). This is especially true in a First Amendment case because of "the sensitive nature of constitutionally protected expression." *Dombrowski v. Pfister,* 380 U.S. 479, 486, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965).

Relying on *Poe v. Ullman,* 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), the Secretary claims that the action is not justiciable because the Elections Code provisions that plaintiffs challenge have never been enforced. In *Poe,* the Supreme Court held that a constitutional challenge to a Connecticut ban on contraceptives was not justiciable because the ban had never been enforced during its seventy-five year history, *id.* at 501, 81 S.Ct. at 1754, even though "contraceptives [were] commonly and notoriously sold in Connecticut drug stores." *Id.* at 502, 81 S.Ct. at 1755. This case, however, is distinguishable from *Poe* in that here we have no record that the relevant provisions have been "commonly and notoriously" violated. Indeed plaintiffs' uncontroverted affidavits show that they have consistently, if reluctantly, obeyed the statutes in conducting party affairs.

Rather than *Poe,* we believe resolution of the justiciability issue is controlled by *Babbitt,* 442 U.S. at 302–03, 94 S.Ct. at 2310–11, and *Epperson v. Arkansas,* 393 U.S. 97, 101–02, 89 S.Ct. 266, 268–69, 21 L.Ed.2d 228 (1968). In both cases, the Court found justiciability notwithstanding a record of non-enforcement because, as distinguished from *Poe,* the record did not show that the statutes had been "commonly and notoriously" violated.[15]

The Secretary further contends that, under *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), federal courts lack the authority to determine that a violation of a challenged state statute is a criminal offense unless the statute has already been enforced through a criminal prosecution.[16] She asserts that because federal courts cannot "instruct[ ] state officials on how to conform their conduct to state law," *id.* at 106, 104 S.Ct. at 911, they are necessarily disabled from finding that a state statute

---

**15.** The Secretary argues without authority that no case or controversy is raised by a challenge to an unenforced criminal statute unless that statute was recently enacted. The Secretary's argument is refuted by *Epperson,* where the Court held the statute justiciable despite its unenforced presence on the books for forty years. *See* 393 U.S. at 109, 89 S.Ct. at 273 (Black, J., concurring). Indeed, the aftermath of *Poe* teaches that federal courts should not lightly determine that a statute has fallen into desuetude. The very statute the Court characterized as a dead letter in *Poe* was struck down in *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), after the state prosecuted two persons, including a doctor, for openly counseling married persons on the use of contraceptives. We note that the Supreme Court did not cite *Poe* in either *Babbitt* or *Epperson.*

**16.** Although the Secretary does not assert in her briefs that violations of these statutes are not criminal offenses, she notes in passing that the state's Chief Deputy Secretary of State and Chief Deputy Attorney General in their declarations take that position. We agree with Judge Patel that, in light of the plain statutory language of Cal.Elec.Code §§ 29102 & 29430, the state officials' apparent disavowal of any intention to enforce these laws is "anomalous." *San Francisco County Democratic Central Committee v. Eu,* No. C–83–5599, at 6 (Order filed May 3, 1984).

requires criminal prosecution. We cannot accept this reading of *Pennhurst.* There the Supreme Court merely held that federal courts had no jurisdiction over an action to compel state officials to adhere to state law. *Pennhurst* does not undermine either explicitly or implicitly the settled rule that when a plaintiff is "one against whom the[ ] criminal statutes directly operate ... a sufficiently direct threat of personal detriment" is alleged. *Bolton,* 410 U.S. at 188, 93 S.Ct. at 745.

**B**

■ Closely related to the case or controversy requirement is the requirement that plaintiffs have standing to bring the action. *See Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). The Secretary argues that plaintiffs lack standing because they would not obtain effective relief from a judicial declaration that the statutes were unconstitutional. The premise of the Secretary's standing argument is that the party central committees have voluntarily adopted the statutory restrictions on preprimary endorsements and internal governance. Under these circumstances, she concludes, plaintiffs have no standing to seek an adjudication of the constitutionality of the statutes.

We reject the Secretary's standing argument. She has made no showing that the political parties have voluntarily adopted the statutory restrictions. Indeed, the uncontroverted affidavits of party representatives indicate the contrary: they would reform the composition of their parties' central committees if the statutes were invalidated. Moreover, all committee plaintiffs say they would make preprimary endorsements if the practice were not prohibited.

The Secretary's argument rests on the premise that legislative action can be equated with voluntary action by political parties. She asserts that:

> when the nominees of a party who are actually elected to the Legislature enact legislation affecting the organization and procedures of the party institutions the legislation is an act of self-governance by the party itself. Appellants presented evidence in the district court to support their motion for summary judgment and to oppose appellee's (sic) motion demonstrating that by custom and practice the political parties represented in the legislature accept each other's party legislation. Obviously, the legislators, who are inherently their party, are also exercising the legislative power of the state.

Appellants' Supplemental Brief Pursuant to Court Order Dated August 5, 1985, p. 3 [hereinafter, "Appellants' Supplemental Brief"].

The Secretary's astonishing argument collapses on its own terms. State legislators are not "inherently their party." Nor do legislative enactments that bind the parties and carry criminal penalties represent the parties' own voluntary action. The exercise of the coercive power of the state is the antithesis of voluntary action by political associations. Regardless of the motives of individual legislators or the quid pro quo arrangements that led to passage of the challenged statutes, the result remains the same: state regulation of political parties.

We hold that plaintiffs have standing to bring this action. To hold otherwise would be to allow the state legislature to endow the committees with "the statutory function of party leadership," 23 Ops. Cal. Atty. Gen. 119, 123 (1954), and place this leadership in the effective control of state legislators, *see California Politics* at 191, without fear that their exercise of legislative power will be reviewed under the First Amendment.[17]

---

**17.** The Secretary also relies on *Marchioro v. Chaney,* 442 U.S. 191, 99 S.Ct. 2243, 60 L.Ed.2d 816 (1979). In *Marchioro,* the plaintiffs contended that the policymaking body of a political party enjoys an absolute First Amendment exemption from state regulation. The Supreme Court rejected the claim without reaching the First Amendment issue by pointing out that state law did not require the central committee to perform any policymaking functions; those

## C

■ The Secretary next argues that plaintiffs' action is barred by the Eleventh Amendment. It is settled law, however, that the Eleventh Amendment does not bar an action seeking prospective relief from enforcement of an unconstitutional statute. *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Because plaintiffs do not seek damages, but only declaratory and injunctive relief, *Ex parte Young* is directly controlling. *See also Edelman v. Jordan*, 415 U.S. 651, 664, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974).

## D

■ Finally, relying on *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), the Secretary contends that the district court should have abstained from adjudicating plaintiffs' first and third counts pending the resolution of litigation in state court raising similar challenges to the Elections Code. In *Pullman,* the Supreme Court held that abstention may be appropriate "when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 236, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984). *Pullman* abstention is inappropriate, however, "when a state statute is not 'fairly subject to an interpretation which will render unnecessary' adjudication of the federal constitutional question." *Id* (citation omitted); *see also Canton v. Spokane School District No. 81*, 498 F.2d 840, 845 (9th Cir. 1974).

Here, the Secretary does not advance an interpretation of the Elections Code that

functions had been freely delegated to the central committee by the party itself. *Id.* at 198 & n. 13, 99 S.Ct. at 2247 & n. 13; *see also* Weisburd, *Candidate-Making and the Constitution, supra* at 270 n. 336. In this case, by contrast, state law compels ballot-qualified parties to adopt the statutory restrictions.

**18.** This court has a "virtually unflagging obligation" to exercise jurisdiction and may abstain only in exceptional circumstances. *Colorado*

would moot the constitutional questions raised by plaintiffs. Nor could she. Section 11702 is clear on its face that central committees may not make preprimary endorsements, and other provisions prescribe in minute detail committee membership and limit the terms of committee chairs. Thus the district court's refusal to invoke *Pullman* abstention was not an abuse of discretion.[18] *See C–Y Development Co. v. City of Redlands,* 703 F.2d 375, 377 (9th Cir. 1983).

## III

■ Before considering plaintiffs' claims that the Elections Code unjustifiably burdens their First Amendment rights, we address the Secretary's contention that the state and county central committees of California's ballot-qualified political parties have no First Amendment rights because they are public entities, not private associations. The Secretary asserts that the legislature transformed the committees from voluntary political associations into public entities "integral [to] the state's election system," Appellants' Supplemental Brief, p. 15, when it dictated the committees' organization and powers and charged them with the responsibility of conducting the general election campaigns of party nominees. *Id.*, p. 13.

In essence, the Secretary argues that by regulating the committees, the legislature may deprive them of First Amendment rights. The Secretary's argument is flawed by "bootstrap reasoning." *Abrams v. Reno,* 452 F.Supp. 1166, 1170 (S.D.Fla. 1978) ("[w]ithout begging the question of the right of a political executive committee to exist and function without the breath of life provided by the election code, it seems

*River Water Conservation District v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976). This unflagging "'obligation is particularly weighty when those seeking a hearing in federal court are asserting ... their right to relief under 42 U.S.C. § 1983.'" *Miofsky v. Superior Court of California,* 703 F.2d 332, 338 (9th Cir.1983) (quoting *Tovar v. Billmeyer,* 609 F.2d 1291, 1293 (9th Cir.1979)).

to be bootstrap reasoning to suggest that election code regulation permits the denial of substantial constitutional rights"), *aff'd*, 649 F.2d 342 (5th Cir.1981), *cert. denied*, 455 U.S. 1016, 102 S.Ct. 1710, 72 L.Ed.2d 133 (1982). Even if the California Elections Code had expressly characterized the committees as public agencies,[19] we would reject the Secretary's premise that a state can strip a voluntary political association of First Amendment rights by legislating it into an arm of the state. In *Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980), for instance, the Supreme Court held that extensive regulation, however beneficial to the public, cannot deprive a utility of its status as a private entity entitled to constitutional rights. *Id.* at 533–34 & n. 1, 100 S.Ct. at 2330–31 & n. 1. Likewise, in *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), the Court repudiated the notion that the status of corporations as "creatures of the state" permits the state to prohibit corporate speech. *Id.* at 778 n. 14, 98 S.Ct. at 1416 n. 14. It follows *a fortiori* that the state cannot abridge the First Amendment rights of political associ-

ations by arguing that regulatory legislation makes them "creatures of the state."[20]

We recognize that California has extensively regulated political parties. The Secretary, however, turns constitutional analysis upside down when she argues that the state regulations are immune from constitutional attack because they deprive the party committees of First Amendment status. The question is not whether the committees lack First Amendment rights because of state regulation. Rather, the question is whether the challenged regulations must fall because they violate the committees' First Amendment rights. Turning to this question, we address the constitutionality of the provisions that regulate the structure and internal affairs of the party committees in Part III. In Part IV, we consider the constitutionality of the ban on preprimary endorsements.

## IV

■ Our analysis of plaintiffs' constitutional claims begins with the fundamental premise that "a significant impairment of First Amendment rights must survive exacting scrutiny." *Elrod v. Burns*, 427 U.S. 347, 362, 96 S.Ct. 2673, 2684, 49 L.Ed.2d

---

**19.** The status of these committees under the Elections Code is less clear than the Secretary would have us believe. The Secretary contends that under *Katz v. Fitzgerald*, 152 Cal. 433, 93 P. 112 (1907), "political parties shall be ... regarded as public bodies whose methods are to be controlled by the state." *Id.* at 435, 93 P. 112. While the state's characterization of state political parties does not bind this court's determination of plaintiffs' First Amendment status, we note that the Secretary's characterization of the committees as public entities is belied by the refusal of both the California Supreme Court and the California Attorney General so to characterize them. *See Unger II*, 37 Cal.3d at 615, 692 P.2d 238 (committees "are not agencies of the state for all purposes"); 59 Ops. Cal. Atty Gen. 60, 61 (1976) (committees "are not public agencies"); 23 Ops. Cal. Atty. Gen. 119, 120 (1954) (committees "are no more public agencies than were their counterparts in the pre-primary era"). Moreover, the contention that the committees are state agencies is somewhat incongruous because unlike the sovereign, party central committees are expected to serve party interests, not the interests of the public at large; specifically, they are charged by statute with the

responsibility of running the general election campaigns of party nominees. *See, e.g.,* Cal. Elec.Code §§ 8776 & 8940.

**20.** The so-called "white primary" cases are not to the contrary. While the Secretary cites *Smith v. Allwright*, 321 U.S. 649, 664–65, 64 S.Ct. 757, 765–66, 88 L.Ed. 987 (1944), for the proposition that political parties are "public bodies" because they are part of the state's machinery for choosing officials, that case held only that a state party's disenfranchisment of black party members in its primary election amounted to state action for purposes of the Fifteenth Amendment. In later cases, the Court has limited *Smith* to its unusual context: a state-mandated racially discriminatory primary scheme in a one-party state where nomination is tantamount to election. In both *Cousins v. Wigoda*, 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975), and *Democratic Party v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981), the Court "appears to reject the argument that an activity is state action solely because it is integral to a state-created election process." Weisburd, *Candidate-Making and the Constitution, supra* at 239 (1984).

547 (1976) (plurality); *see also Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290, 294, 102 S.Ct. 434, 436, 70 L.Ed.2d 492 (1981). If, as plaintiffs allege, the state regulations interfere with their rights to free association and free expression, the regulations can survive First Amendment scrutiny only if the Secretary shows that they are "necessary to serve a compelling interest." *Illinois State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979); *see also Kusper v. Pontikes,* 414 U.S. 51, 58–59, 94 S.Ct. 303, 308–09, 38 L.Ed.2d 260 (1973) ("even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty").[21]

We first consider whether the state's regulation of the selection of state committee members and the term of office of committee chairs burdens plaintiffs' First Amendment rights. We then consider whether the regulations serve compelling state interests. *See Anderson v. Celebrezze,* 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983).

### A

"[T]he right of individuals to associate for the advancement of political beliefs" is fundamental, *Williams v. Rhodes,* 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968), and includes the "freedom to identify the people who constitute the association, and to limit the association to those people only." *Wisconsin ex rel. La Follette,* 450 U.S. at 122, 101 S.Ct. at 1019. Because the

right of association would be hollow without a corollary right of self-governance, "there must be a right not only to form political associations but to organize and direct them in the way that will make them most effective." *Ripon Society Inc. v. National Republican Party,* 525 F.2d 567, 585 (D.C.Cir.1975), *cert. denied,* 424 U.S. 933, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976). Thus the party's freedom of association necessarily includes the right "to choose its own structure, select its own standard bearers, and formulate its own platform—all free from the intrusion of state regulation." *Republican Party v. Tashjian,* 770 F.2d 265, 281 (2d Cir.1985); *see also Ripon Society Inc.,* 525 F.2d at 585 ("a party's choice, as among various ways of governing itself, of the one which seems best calculated to strengthen the party and advance its interests, deserves the *protection* of the Constitution . . . .") (emphasis in original).

It is readily apparent that the regulations burden the parties' right to govern themselves as they think best. By legislative fiat, the state vests party leadership in the central committees, determines the size of the committees, and apportions their membership according to a statutory formula. Whether this formula is or is not "best calculated to strengthen the party and advance its interests," *Ripon Society Inc.,* 525 F.2d at 585, is irrelevant to First Amendment analysis. It is the right of the party, not the state, to decide how the party shall be governed. *See id.*

**21.** The Supreme Court has developed the following detailed methodology for deciding whether laws that impinge on associational freedoms violate the First Amendment:

[A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's

rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson v. Celebrezze,* 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983); *see also Socialist Workers Party v. Secretary of State,* 765 F.2d 1417, 1418 (9th Cir.1985). We do not construe *Anderson* as disturbing the settled rule that laws that restrict First Amendment freedoms must "be demonstrably supported by not only a legitimate state interest, but a compelling one." *Brown v. Hartlage,* 456 U.S. 45, 53–54, 102 S.Ct. 1523, 1528–29, 71 L.Ed.2d 732 (1982).

In stacking the deck heavily in favor of elected officials and party nominees, the legislature has dictated to each ballot-qualified party an organizational structure that may not be the party's choice. For example, a party trying to adapt to changing conditions may have interests that differ from the interests of entrenched incumbents. Commentators have noted that the pro-incumbent composition and unwieldy size of California's state central committees have made them "fairly rigid organization[s] incapable of adjusting and responding to changing conditions." *California Politics, supra* at 186.

The experience of the Libertarian party exemplifies the plight of a political party forced to operate under state-mandated rules of governance. When the Libertarian party qualified for the ballot, it was forced to jettison its "preferred and natural" party organization and replace it with one already mandated for one of the existing qualified parties.[22] *See* Declaration of Mary Gingell. After adopting the rules of the Peace and Freedom Party as the least objectionable interim model, the Libertarians drafted a body of rules specifically tailored to their party's distinctive needs. When presented to the legislature, the proposed rules languished and died in committee. *See id.* Thus, the Libertarian party has been compelled by the state to organize itself in a way considered inimical to its political interests. *Cf. Tashjian,* 770 F.2d at 283 & n. 25.

■ Moreover, we believe that the challenged regulations directly interfere with the parties' free expression by inevitably coloring the message that the parties communicate to the electorate. *See Tashjian,* 770 F.2d at 282 ("in light of the intimate relationship between the structure of a political association and the message ultimately transmitted by that group, ... the inexorable effect of [regulating the structure of political parties] is to alter the Party's message"). By favoring incumbents, the California legislature may give ballot-qualified parties a pro-incumbent image that impedes their associational goals.[23] For instance, a party's efforts to change political course may be frustrated by the incumbent bias inherent in its organizational structure. We do not intend to say that elected officials and party nominees are incapable of providing strong and effective leadership. What we do intend to say is that when the state restricts a party's freedom to choose its leadership, the state burdens the party's First Amendment rights.

The parties' associational right to choose their own leadership is also burdened by the single-term limit on committee chairs. In limiting committee chairpersons to one two-year term—regardless of their popularity and effectiveness—the legislature has impaired the parties' ability to commit their fortunes to experienced and successful leadership. As Judge Patel recognized below, parties are "gravely weakened if the members are not permitted to make use of an able leader for a long enough period of time to ensure effective administration." *San Francisco County Central Committee v. Eu,* No. C–83–5599 at 20 (Order filed May 3, 1984).

**B**

Having established that the challenged regulations burden plaintiffs' First Amendment rights, we turn to "the precise inter-

---

**22.** Parties that newly qualify for the ballot by demonstrating adequate electoral strength under Cal.Elec.Code § 6430 are required to conform their operations to the statutory blueprint prescribed for one of the existing ballot-qualified parties. *Id.* § 9955. The Libertarian party qualified in 1980. Declaration of Mary Gingell.

**23.** Commentators have noted that mandatory organizational provisions damage a party's freedom to determine its own message. *See* Weis-

burd, *Candidate-Making and the Constitution, supra* at 260–61 ("requiring a particular form of party organization can prevent party adherents from attaining objectives inconsistent with that required form of organization"); *cf.* Note, *Primary Elections and the Collective Right of Freedom of Association,* 94 Yale.L.J. 117, 126 (1984) ("a political party's ability to define its boundaries cannot be separated from the party's ability to determine its political ideology").

ests put forward by the State as justifications for the burden imposed by its rule." *Anderson*, 460 U.S. at 789, 103 S.Ct. at 1570.

The Secretary claims that the state has a compelling interest in sheltering the state central committees from the internecine strife of the primary elections so that the committees will be in a strong position to carry out their statutory responsibility of running the general election campaigns of party nominees. This interest in avoiding factionalism, the argument goes, justifies state interference with the associational rights of political parties and their adherents. The Secretary argues that vesting control of the state committees in elected officials and party nominees assures that the committees will be broadly representative and resistant to factionalism.

The Secretary also cites the state's professed interest in restraining factions as justification for limiting the terms of party chairs. She argues that when the term limitation is combined with the statutory requirement that chairs rotate between northern and southern California, friction between these distinct regional interests is minimized.

In sum, the Secretary maintains that the Election Code provisions regulating the membership of state central committees and limiting the terms of committee chairs serve the state's assertedly compelling interest in avoiding "splintered parties and unrestrained factionalism." *Storer v. Brown*, 415 U.S. 724, 736, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974).

Even if the Secretary could demonstrate that the state's regulation of ballot-qualified parties served its asserted interest in minimizing party faction, we disagree that promoting harmony in political parties is a compelling state interest. We recognize that the state's responsibility to hold elections and certify the results gives rise to a legitimate state interest in regulating elections. Without question, the state may act to protect "the integrity of the electoral process." *Rosario v. Rockefeller*, 410 U.S. 752, 761, 93 S.Ct. 1245, 1251, 36 L.Ed.2d 1

(1973). As the Supreme Court said in *Storer*, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." 415 U.S. at 730, 94 S.Ct. at 1279.

Because of its compelling interest in orderly elections, the state may restrict access to the ballot. *See Bullock v. Carter*, 405 U.S. 134, 145, 92 S.Ct. 849, 857, 31 L.Ed.2d 92 (1972) (the state "has a legitimate interest in regulating the number of candidates on the ballot"). Toward this end, the state may require that candidates meet minimum standards to qualify for the ballot in order to keep "its ballots within manageable, understandable limits," *Lubin v. Panish*, 415 U.S. 709, 715, 94 S.Ct. 1315, 1319, 39 L.Ed.2d 702 (1974), "avoid voter confusion, and assure that the winner is the choice of a majority ... of those voting, without the expense and burden of runoff elections." *Bullock*, 405 U.S. at 145, 92 S.Ct. at 857. For example, independent candidates may be required to present nominating petitions that demonstrate "a significant modicum of [electoral] support." *Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971); *see also American Party of Texas v. White*, 415 U.S. 767, 782, 94 S.Ct. 1296, 1306, 39 L.Ed.2d 744 (1974). The state may also require the payment of filing-fees to weed out spurious candidacies, *see Bullock*, 405 U.S. at 145, 92 S.Ct. at 857, so long as the fees are not excessive or a bar to indigent candidates. *Lubin v. Panish*, 415 U.S. at 717–18, 94 S.Ct. at 1320–21. Further, the state may protect the integrity of its primary elections by imposing a waiting period before voters can switch their registered party affiliation, *Rosario v. Rockefeller*, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973), and before candidates registered with one party can renounce their affiliation to run as independent candidates. *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974).

■ It is equally clear, however, that the state's interest in "the stability of its politi-

cal system", *Storer*, 415 U.S. at 736, 94 S.Ct. at 1282, does not extend to regulations that effectively restrict the ballot to the major parties or that ensure that the major parties remain ballot-qualified. *Williams*, 393 U.S. at 32, 89 S.Ct. at 11; *see also Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 185–86, 99 S.Ct. 983, 990–91, 59 L.Ed.2d 230 (1979). As the Supreme Court noted in a related context, "care must be taken not to confuse the interest of partisan organizations with governmental interests." *Elrod*, 427 U.S. at 362, 96 S.Ct. at 2684. Thus, although the state's interest in orderly elections allows it to impose reasonable, non-discriminatory restrictions on ballot access, the state may not go to bat for political parties to assure that they remain ballot-qualified. In other words, the state has no interest in regulating political parties for the purpose of helping them win or retain voter support. Political parties are nothing more than voluntary associations of individuals who band together in pursuit of shared political goals. A party's survival depends upon its ability to compete in the free marketplace of political ideas and ideals. The First Amendment limits the state to a neutral role in that competitive process. The state may not interfere with the associational rights of political parties beyond what is necessary to assure honest and orderly elections.

The Secretary relies upon *Storer v. Brown* as support for her argument that the state may prescribe the composition of state central committees and limit the terms of party chairs because of the state's asserted interest in assuring strong consensus leadership for the general election cam-

paigns. We believe her reliance on *Storer* is misplaced.

In *Storer*, the Court upheld a California "sore loser" statute that required independent candidates for political office to disaffiliate from their former political party at least one year prior to the party primary. *Storer* recognizes that the state's legitimate interest in limiting access to the general election ballot entitles it to reserve that ballot for "major struggles," free of the destabilizing effect of "continuing intraparty feuds." *Storer*, 415 U.S. at 735, 94 S.Ct. at 1281; *see also American Party of Texas*, 415 U.S. at 781, 94 S.Ct. at 1306 (the state "may insist that intraparty competition be settled before the general election....."). But critical to the *Storer* holding was that California's disaffiliation provision did not attempt to control intraparty feuding during the primary campaigns. To the contrary, the primary was recognized as the forum in which "contending forces within the party finally settle their differences." *Storer*, 415 U.S. at 735, 94 S.Ct. at 1281; *see also Anderson*, 460 U.S. at 803, 103 S.Ct. at 1577 (the *Storer* Court did not "suggest that a political party could invoke the powers of the State to assure monolithic control over its own members and supporters."). *Storer* does not stand for the proposition that the state has a compelling interest in perpetuating strong ballot-qualified parties. Nor does *Storer* authorize states to regulate political parties in an effort to keep them strong and conflict-free. In sum, the state has no legitimate interest in promoting the generalized goal of "compromise and political stability." *Williams*, 393 U.S. at 32, 89 S.Ct. at 11.[24]

---

**24.** Likewise, the Secretary's use of *Marchioro v. Chaney*, 442 U.S. 191, 99 S.Ct. 2243, 60 L.Ed.2d 816 (1979), to support the challenged governance provisions outstrips the limited rationale of that case. In *Marchioro*, the State of Washington attempted to require that the state central committee be composed in a representative fashion. The authorizing statute empowered the central committee to perform certain limited duties, such as calling party conventions and filling vacancies on the party ticket. In addition, the charter of the Democratic Party delegated to the committee considerable responsi-

bility in raising funds, recruiting candidates, and setting general policy. The plaintiffs, would-be committee members who were elected pursuant to a charter amendment that sought to supplement the membership stipulated by state law, sued to enjoin their exclusion based on the statute on the ground that a party policymaking body enjoyed a First Amendment exemption from state regulation. The Supreme Court dismissed the plaintiffs' claim without resolving the constitutionality of the Washington regulations. The Court noted that the party freely delegated the committee powers upon which the

When we apply these principles to the California Elections Code, it becomes evident that the state's asserted interest in fostering party leadership does not derive from the state's legitimate interest in orderly elections. Weak and divided campaign leadership may result in defeat at the polls, but it does not threaten the state's interest in an orderly election process. The Secretary's argument confuses campaigns with elections, partisan interests with the interests of the state. We conclude, therefore, that regulations designed to give ballot-qualified parties effective campaign leadership do not rest on a compelling state interest.

### C

Moreover, even if we assume that the state has a compelling interest in minimizing party faction, the Secretary has failed to carry her burden of showing "a substantially relevant correlation between the governmental interest asserted," *Pacific Gas & Electric Co. v. Public Utilities Commission of California*, — U.S. —, 106 S.Ct. 903, 913, 89 L.Ed.2d 1 (1986), and the Elections Code sections regulating the selection of state committee members and the term of office of their chairs. We agree with Judge Patel that the Secretary failed to submit "a shred of evidence", *San Francisco County Central Committee v. Eu*, at 22, in support of her claim that unregulated parties would be more vulnerable to "the predations of faction." Defendant-Appellants' Supplemental Brief, p. 44. In opposing plaintiffs' summary judgment motion on the merits, the Secretary relied exclusively on the affidavit of retired Democratic state senator Albert S. Rodda, Jr., a long-time member of the Democratic state central committee. As Judge Patel observed, this affidavit consists of "opinions

... not based on facts, but on speculations." *San Francisco County Central Committee v. Eu*, at 16. With respect to the provisions that regulate committee governance, Rodda makes the single conclusory statement that they "provide some protection against devices used by factions to exclude others from participation in party affairs." Affidavit of Albert S. Rodda, Jr.

The Rodda affidavit fails to controvert plaintiffs' declarations concerning the impact that the challenged Elections Code provisions have on political parties. Plaintiffs' declarations demonstrate that these provisions weaken rather than strengthen the leadership of ballot-qualified parties. For example, the provisions regulating state committee membership stifle party debate by overrepresenting elected officials. Declarations of David E. Sturrock and Bert Coffey. Plaintiffs have also shown the difficulty of effecting a change in party leadership because party initiatives are left to the mercy of a slow-moving, possibly recalcitrant legislature. Declaration of Hugh Bone.

Finally, plaintiffs' declarations show that the state's extensive regulation of party leadership discourages able people from taking an active role in party organization and hinders a party's recruitment of new leaders. Declarations of Bert Coffey and Austin Ranney. Although the Secretary claims that the challenged regulations invigorate and democratize the parties, as the Progressives ostensibly set out to do, *see supra* at 805, the record demonstrates the opposite: in fact, the parties have become weak and fossilized. Thus, we conclude that the Secretary has failed to demonstrate that the state's regulations advance its professed interest in strong party leadership.[25]

---

plaintiffs predicated their challenge; and plaintiffs did not oppose the committee's performance of its state-imposed duties. *Id.* at 197–98, 99 S.Ct. at 2247–48. Thus, the Court held that the source of the plaintiffs' grievance was the party's exercise of its right of self-governance, not state interferences with that right. *Id.* at 199, 99 S.Ct. at 2248.

**25.** We find it ironic that the Secretary claims that the Progressives' reform of political parties strengthened party leadership when the Attorney General of California once rendered a formal opinion that the reforms reflect the Progressives' intent "to minimize the role of the established party agencies." 23 Ops. Cal. Atty. Gen. at 122.

## V

■ Finally, we consider the constitutionality of California's outright ban on partisan preprimary endorsements, Cal. Elec.Code § 11702.[26] Because section 11702 prohibits political speech, the inviolability of which rests at the core of the First Amendment, *see, e.g., Buckley v. Valeo,* 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976); *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971), we must subject the section to strict scrutiny. "[W]here ... a prohibition is directed at speech itself, and the speech is intimately related to the process of governing, 'the State may prevail only upon showing a subordinating interest which is compelling.' " *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 786, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978) (quoting *Bates v. Little Rock,* 361 U.S. 516, 524, 80 S.Ct. 412, 417, 4 L.Ed.2d 480 (1960)). Moreover, " 'the burden is on the government to show the existence of such an interest.' " *Bellotti,* 435 U.S. at 786, 98 S.Ct. at 1421 (quoting *Elrod,* 427 U.S. at 362, 96 S.Ct. at 2684). Finally, "the state action may be sustained only if the government can show that the regulation is a precisely drawn means of serving" its interests. *Consolidated Edison Co. v. Public Service Commission,* 447 U.S. 530, 540, 100 S.Ct. 2326, 2334, 65 L.Ed.2d 319 (1980).

The Secretary argues that the ban on preprimary endorsements serves three state interests that she claims to be compelling: (1) avoiding party factionalism; (2) protecting voters from the undue influence of party leaders; and (3) minimizing voter confusion. We will address each interest in turn.

## A

The Secretary asserts that the ban on preprimary endorsements serves the state's interest in averting internal party dissension and factionalism. As we discussed above, the state's interest in regulating political parties derives from its role in conducting the primary and general elections and certifying election results. We held that the state has no interest in assuring that ballot-qualified parties remain strong and vigorous. We now hold similarly that the state's asserted interest in preserving party cohesion during primary election campaigns is not a compelling interest that could justify a prohibition on preprimary endorsements. Moreover, even if preserving party cohesion during primary campaigns were a compelling state interest, the Secretary has made no showing that banning preprimary endorsements sufficiently serves that interest to justify an outright prohibition on political speech.[27]

The Secretary again cites *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), for the proposition that the state has a compelling interest in preventing party committees from disintegrating into hostile factions during primaries, thereby disabling them from running the general election campaigns of party nominees. According to the Secretary, section 11702 advances this interest by disembroiling the committees from the primary contest. Thus, the argument goes, opportunistic primary candidates have no reason to seize control of the party leadership. Likewise, the leadership's enforced neutrality among primary rivals encourages the preservation of party resources for the eventual party nominee.

The Secretary's reliance on *Storer* is misplaced. *Storer* recognized that the state's interest in limiting access to the general

---

26. Until recently, Florida was the only state other than California that forbade partisan preprimary endorsements. *See* Weisburd, *Candidate-Making and the Constitution, supra* at 271 n. 343. The Florida statute was held to violate the First Amendment in *Abrams v. Reno,* 452 F.Supp. 1166, 1170 (S.D.Fla.1978), *aff'd* 649 F.2d 342 (5th Cir.1981), *cert. denied,* 455 U.S. 1016, 102 S.Ct. 1710, 72 L.Ed.2d 133 (1982).

27. Thus, in our view, the only conceivable basis for justifying the ban on preprimary endorsements would be that the central committees possess no First Amendment rights because they are public entities. We have already rejected the Secretary's argument to that effect. *See* Part III, *supra.*

election ballot entitles it to prevent "sore losers" from running again as independent candidates. 415 U.S. at 734, 94 S.Ct. at 1281. Moreover, *Storer* viewed the primary as set apart for healthy intraparty confrontation, even bloodletting. *Id.* at 735, 94 S.Ct. at 1281. It offers no support for the Secretary's claim that the state has a compelling interest in fostering party cohesiveness during primaries.

Even if we assume that the state has such an interest, the Secretary made no showing that the ban on preprimary endorsements preserves party cohesion. Again, the only affidavit she submitted was the declaration of former state senator Rodda, and this affidavit consists of unsupported conjecture.

Plaintiffs' uncontroverted affidavits, on the other hand, bear out the following: First, section 11702 has eroded the parties' ability to identify, recruit, and promote "strong opposition candidates." Declaration of David E. Sturrock. In the void caused by silencing the committees' power of endorsement, each candidate forms an ad hoc committee to run his primary campaign and, if he is successful, that committee goes on to run the general election campaign independently of the party organization. The result of banning preprimary endorsements, according to the affidavit of Williams College political scientist James MacGregor Burns, is that party control degenerates into a "personalistic system that caters to irresponsible political campaigning and public service." Thus, as Burns concludes, "taking away the endorsement power strikes at the very core of the party." *See also* Declaration of Eugene Lee ("[a] political party unable to endorse candidates is, by definition, a weak party"); *California Politics, supra* at 5 ("[C]alifornia campaigns are highly personalized extravaganzas').

Second, plaintiffs showed that in states that permit partisan primary endorsements, the practice is generally used in a selective, circumspect fashion so as not to endanger party unity. Several affiants experienced in the politics of other states testified that when no candidate has been the clear favorite of the party leadership, the leadership has either refrained from issuing controversial endorsements or endorsed several candidates in the same race. *See, e.g.,* Declarations of Eugene Lee and James MacGregor Burns. Moreover, the ability to issue endorsements has helped party leadership distinguish candidates genuinely allied with the party from candidates who are essentially masquerading as party adherents. In California, conversely, the ban on preprimary endorsements has on occasion allowed hostile candidates to win the party nomination. For instance, in a much-publicized episode discussed in plaintiffs' affidavits, a grand dragon of the Ku Klux Klan campaigned for and won the 1980 Democratic party nomination for Congress in the San Diego area while the Democratic county central committee remained powerless to oppose him. Declaration of Edmond Constantini.

In sum, the Secretary has failed to show that section 11702 serves party cohesion. Thus, even if we considered party cohesion to be a compelling state interest, we would conclude that the Secretary has failed to show that the interest is furthered by banning preprimary endorsements.

**B**

The Secretary further claims that the ban on preprimary endorsements is justified by the state's interest in safeguarding the right of party adherents to choose primary candidates without undue influence from the party leadership. The Secretary thus attempts to justify the restraint on committee speech by arguing that the ban promotes the First Amendment rights of party rank and file. We must reject the argument that one person's First Amendment rights may be restricted in order to enhance the rights of another.

It is by now settled First Amendment law that the state may not "restrict the speech of some elements of our society in order to enhance the relative voice of others." *Buckley,* 424 U.S. at 48–49, 96 S.Ct. at 648–49, *quoted in Bellotti,* 435 U.S. at

790–91, 98 S.Ct. at 1423–24; *see also Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). In *Bellotti*, the state argued that curbing corporate speech in referenda elections furthered "the State's interest in sustaining the active role of the individual citizen in the electoral process." *Bellotti*, 435 U.S. at 787, 98 S.Ct. at 1422. The Supreme Court rejected this argument on the ground that the First Amendment does not tolerate discriminatory silencing measures designed to equalize political debate. Thus, *Bellotti* forecloses the Secretary's argument that the ban on preprimary endorsements is constitutionally acceptable because in the state's judgment it yields an outcome favorable to free speech. *See also Pacific Gas & Electric v. Public Utilities Commission of California*, —— U.S. ——, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986).

With the exception of cases upholding laws carefully tailored to proscribe fraud and corruption, *see, e.g., Buckley*, 424 U.S. at 26–27, 96 S.Ct. at 638–39, the Secretary cites no authority for the proposition that the state can regulate the flow of information between political associations and their members. Prohibiting the governing body of a political party from supporting some candidates and opposing others patently infringes both the right of the party to express itself freely and the right of party members to an unrestricted flow of political information. *See Pacific Gas & Electric*, 106 S.Ct. at 907 ("The First Amendment protects the public's interest in receiving information"); *cf. Brown v. Hartladge*, 456 U.S. 45, 60, 102 S.Ct. 1523, 1532, 71 L.Ed.2d 732 (1982) ("[by] *the free exchange of ideas* ... the people are to choose ... between candidates for political office") (emphasis added). We cannot accept the Secretary's claim that denying voters access to the views of party leadership somehow enhances their First Amendment rights.

In any case, we would reject "the 'highly paternalistic approach' of statutes like [section 11702] which restrict what the people may hear." *Bellotti*, 435 U.S. at 791 n. 31, 98 S.Ct. at 1424 n. 31 (quoting *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 770, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)). As *Bellotti* teaches, "the people in our democracy are entrusted with the responsibility for ... evaluating the relative merits of conflicting arguments [and] the source and credibility of the advocate." 435 U.S. at 791–92, 98 S.Ct. at 1423–24; *cf. Police Department v. Masley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972) ("government has no power to restrict expression because of its message, its ideas, its subject matter, or its content"). Plaintiffs' affidavits confirm what is implicit in the First Amendment: when the people are exposed to a public debate that is "uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964), they are fully capable of thinking for themselves. Party endorsements are unrestricted in all other states, *see supra* at n. 26; and plaintiffs' affidavits show that the electorate of these states typically considers the party's imprimatur as simply one relevant datum in the pool of information on rival candidates for the party nomination. Declarations of Donald Fraser, Malcolm Jewell, and Bert Coffey. Thus, the Secretary's fear that party members will blindly rubber-stamp the party's endorsement is speculation not borne out by either experience or common sense. California's ban on preprimary endorsements is a form of paternalism that is inconsistent with the First Amendment.

### C

Finally, the Secretary attempts to justify the ban on preprimary endorsements on the ground that it minimizes voter confusion.[28]

**28.** Legislative findings preceding § 11702 report "considerable public doubt and confusion" arising from the promulgation of deceptive endorsements. Cal.Elec.Code § 11701(3). The California courts that have enforced § 11702 have stated that minimizing voter confusion was the principal motive behind the enactment. *See People v. Crutcher*, 262 Cal.App.2d 750, 752–53,

She asserts that voters might be confused if they are not sheltered from the views of party leadership. The Secretary's apparent concern is that voters will be discouraged from participating in the primary election because they will view the party-endorsed candidate as the party's foreordained choice.

Again, we think that the Secretary has given voters too little credit. She has made no showing in support of her charge that voters will be confused by party endorsements. To the contrary, plaintiffs have made a showing that voters understand that endorsements are intended to counsel, not pre-empt their votes, and that the primary victor alone constitutes the general election candidate of the party. Analyzed properly, the asserted state interest in avoiding voter confusion collapses into a professed interest in ensuring that voters do not cast their primary ballots in unthinking obedience to party directives. On this score, we agree with the Second Circuit that "a state certainly does not have a compelling interest in shielding from confusion those voters who engage in unthinking and Pavlovian reliance on party labels." *Tashjian,* 770 F.2d at 284. Moreover, to the extent that the risk of confusion arises because the central committees carry the official imprimatur of the state, state legislation—not the inherent coerciveness of party endorsements—is the root of the problem.

California's asserted interests are insufficient to justify its ban on preprimary endorsements. Accordingly, we hold that section 11702 violates the First Amendment.

The judgment of the district court invalidating the provisions of the California Elections Code that regulate the selection of state central committee members, limit the term of office of committee chairs, and prohibit state and county central committees from endorsing, supporting, or opposing candidates in party primary elections is **AFFIRMED.**

68 Cal.Rptr. 904 (1968); *California Democratic Council v. Arnebergh,* 233 Cal.App.2d 425, 430, 43 Cal.Rptr. 531 (1965).